UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No.  08 CR 458 |
| v. ) | |
| ) | Hon. Virginia Kendall |
| ) | Emergency Judge |
| RAMI JAFILAN ) | |

## MOTION TO VACATE RELEASE ORDER

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, respectfully moves the Court, pursuant to 18 U.S.C. § 3145(a)[1], to enter an order vacating Magistrate Judge Sidney Schenkier's June 23, 2008, order releasing defendant Rami Jafilan on bond.  As set forth below, the defendant is both a danger to the community and a risk of flight and should be detained. 18 U.S.C. §§ 3142(e) and (f).  Moreover, as described more fully below, there is no condition or combination of conditions that will assure defendant's appearance in Court and the safety of the community. 18 U.S.C. § 3142(e).

---

[1] Title 18, United States Code, Section 3145(a) provides that "[i]f a person is ordered released by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court ... the attorney for the government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order ... ."

1

## **FACTUAL BACKGROUND**

The government has charged defendant Rami Jafilan with armed bank robbery, in violation of Title 18, United States Code, Sections 2113(a) and 924(c). The complaint and supporting affidavit allege that defendant planned and, with the assistance of several other persons, carried out an armed, takeover-style robbery of a TCF Bank in Palos Height, Illinois.  Defendant and one of his co-conspirators stormed the bank shortly before it closed for the day on May 6, 2008.  Defendant wielded a .38 caliber handgun while the other gunman was carrying a replica shotgun. Immediately upon entering the bank, in accordance with the plan, defendant ran straight to the security guard with his weapon pointed and forced him to lie on the ground while the other gunman jumped the counter and forced the tellers to take him into the vault, where he had the tellers place approximately $170,000 in cash into a bag.  Defendant then ordered the guard into the vault at gunpoint, and both robbers fled the scene.

The complaint was based on evidence provided by three witnesses whose statements were well corroborated.  One witness confessed to being one of defendant's co-conspirators.  This individual was present during defendant's planning of the robbery and was involved in getaway from the robbery scene.  The other witnesses were persons independent of the robbery who had known defendant for some time and who heard him and some of his co-conspirators confess to the robbery.  Numerous aspects of these witnesses' statements have been corroborated by video surveillance at the bank and at two different hotels.  The robbery

participants' cell phone records, including those of the defendant, also corroborate significant aspects of the witnesses' statements.

Additionally, since the filing of the complaint, the government has developed evidence suggesting that defendant – possibly with the complicity of members of his family, including the proposed bond co-signors and third party custodian – recently left the jurisdiction to secure some of the bank robbery proceeds. Specifically, in late May 2008, after several of defendant's associates had been arrested and charged in the robbery and defendant himself had been interviewed by the FBI in connection with the robbery, the FBI learned that defendant and his brother had driven to California. Investigators believe that at this time, $100,000 or more of the robbery proceeds remained missing. While in California, defendant purchased a secured cash box. He also purchased a Ford Expedition. A friend then flew out to California to help him and his brother drive their old car and the Expedition back to Chicago.

On June 4, 2008, the government filed a criminal complaint charging defendant with bank robbery and use of a firearm in furtherance of that crime. That same day, FBI agents sought to locate defendant and execute his arrest warrant. An FBI agent who had previously interviewed defendant as a suspect in this case contacted defendant on his cellular telephone. Defendant hung up on the agent. The FBI interviewed defendant's family at their home, where defendant resides. The family stated that they did not know defendant's whereabouts. At the FBI's request, defendant's father attempted to call defendant and left a message on

defendant's cellular telephone stating in effect that the FBI was looking for him. Shortly after this, investigators learned that defendant had traveled to California, and they again questioned defendant's family. The family advised the FBI that they did not know of any contacts the defendant had in California, and that they did not know he had gone there or why. They did not state that defendant had an aunt in California, nor that defendant's brother had gone with defendant.[2]

Four days later, on June 8, 2008, defendant and his friend were pulled over in Nebraska while en route back to Chicago from California (it is believed that defendant's brother was driving defendant's original car and was not pulled over). During that traffic stop, a Nebraska state trooper executed a consensual search of the Expedition. The trooper recovered a secured cash box containing $27,000 in $20 and $50 denominations. The individual traveling with defendant offered to bribe the trooper with one half of the $27,000, at which point the trooper arrested him and detained defendant. Defendant and his passenger were both then interviewed. Defendant told the trooper that he had gone to California on around May 25, 2008, to purchase the Expedition and had stayed with his aunt while there. He further stated that he had saved exactly $5,995 to purchase the vehicle, and that was all the money he had. When asked about the money in the cash box, defendant stated

---

[2] It is likewise worth noting that when Pretrial Services first contacted the family to verify the information defendant had provided, the officer first spoke with a female who stated that she was defendant's mother. After having conducted much of the interview, the officer became suspicious of the female's identity and confronted her. The female then admitted to being defendant' sister, not his mother. It was at this time that defendant's mother spoke to Pretrial Services.

that there was between $15,000 and $16,000 in it, and he had saved it while working. Defendant had previously advised that he had worked for McDonald's, Target, and Speedway in the past but that he had been unemployed for the past two months. Defendant then stated that the money from the cash box was in California because he had given it to a friend out there to hold for him because they were going to open a business together in Chicago.

After defendant returned from California, on June 12, 2008, eight days after the issuance of his arrest warrant in this case and seven days after defendant had hung up on the FBI agents seeking to execute that warrant, defendant finally surrendered himself to authorities.

## PROCEDURAL BACKGROUND

On June 17, 2008, Magistrate Judge Sidney I. Schenkier held defendant's detention hearing. The government argued for defendant's detention pending trial based in part on defendant's substantial arrest record and poor track record while under court supervision. Specifically, during a fifteen-month period shortly preceding the robbery in this case, between the ages of nineteen and twenty, defendant was arrested six times, five of which arrests were for violent offenses. The longest gap in between any two arrests during this period was seven months, and the shortest gap was one month. In addition to these arrests, during this same time period, a restraining order was entered against defendant prohibiting him from "physical abuse, harassment, willful deprivation, stalking, and intimidation of a dependent."

Defendant's criminal history reveals that these multiple arrests occurred while defendant was under various forms of court supervision. On November 8, 2006, defendant was charged in the Circuit Court of Cook County with Domestic Battery. While this charge was pending, defendant was arrested three times and charged once with theft and twice with battery. In addition, on October 5, 2007, defendant was found guilty of battery in connection with one of these arrests. He received a one-year supervisory term for this offense. That term does not expire until October 4, 2008. Thus, at the time of the armed, takeover bank robbery in the instant case, defendant was under court supervision.

At defendant's detention hearing, the government argued that 18 U.S.C. § 1342(e) provided for a rebuttable presumption of detention in this case. The government also emphasized the seriousness and violent nature of the charges, and the strength of the evidence of defendant's guilt. The government further noted defendant's ties to a non-extradition country, as well as the 8-day time period in which defendant knew he was wanted yet did not come forward.

Judge Schenkier concluded that defendant should be released on conditions of bond. Judge Schenkier found that 18 U.S.C. § 3142(e)'s rebuttable presumption of detention in cases of crimes of violence and violations of 28 U.S.C. § 924(c) did not apply because there had not yet been a probable cause finding. Judge Schenkier then found that defendant had significant ties to the Chicago area, and that although his criminal history included several arrests for violent offenses while

under court supervision, because it only included one guilty adjudication, it did not establish a pattern of failing to comply with the law and conditions of release.

Judge Schenkier required the defendant's parents, with whom defendant lives, to co-sign on a $50,000 bond and post their home as security.  The family has no equity in that property.  Judge Schenkier reasoned that the fact that defendant's family lives there would provide an emotional incentive for defendant to abide by the law and conditions of release.  Judge Schenkier also stated that he will require that the defendant's mother to act as third-party custodian, and additionally that defendant must participate in home detention with electronic monitoring.  Judge Schenkier continued the hearing until Monday June 23, 2008, to allow the parties time to execute the paperwork necessary for the posting of real property as bond security.

Between the initial June 17, 2008, hearing and the June 23, 2008, continued hearing in this matter, the government received much of the information detailed above regarding defendant's trip to California and his traffic stop in Nebraska.  At the continued hearing, the government presented the new information to Judge Schenkier and argued that the information further supported detention in this case in that it: (a) shows that the defendant has been concealing and actively trying to secure the bank robbery proceeds, many of which remain missing; (b) reflects that the defendant has out-of-state ties in addition to his ties to the country of Jordan; and (c) suggests that one or more members of defendant's family have been assisting him, and his parents were either oblivious to defendant's whereabouts for

two weeks even though he lived at home and was staying with another family member in California, or they were actively concealing his location from the FBI when agents interviewed them. Judge Schenkier found that the information regarding defendant's trip to California and traffic stop in Nebraska did not significantly alter his initial detention analysis, but Judge Schenkier did find that an increase in the amount of defendant's bond to $125,000 was appropriate. Following completion of the bond paperwork, Judge Schenkier stayed the execution of the release order until June 24, 2008, at 10:00 a.m. so that the government could pursue an appeal if it elected to do so.

## **ARGUMENT**

In cases involving crimes of violence, the government may seek the defendant's detention pending trial, pursuant to 18 U.S.C. § 3142(f)(1)(A). In such cases, Section 3142(e) requires that a judicial officer detain a defendant pending trial where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." Should a defendant be ordered released by a magistrate judge, the government may file with the district court a motion for revocation of the order. 18 U.S.C. § 3145(a)(1). The district court's review is de novo. *U.S. v. Messino*, 842 F.Supp. 1107, 1109 (N.D. Ill. 1994); *see also U.S. v. Torres*, 929 F.2d 291, 292 (7th Cir. 1991).

The government respectfully submits that there is a rebuttable presumption of detention here and that defendant has not overcome it, and that in any case there

are no release conditions that would reasonably assure the defendant's appearance and the safety of the community. Detention is necessary in a case like this one where: the offense charged is violent, involving coercion of innocent victims through the brandishing of a firearm; where the charged offense was committed while the defendant was under court-imposed supervision following a guilty finding on a violent offense; where the defendant has been arrested seven times in the past twenty months, six times for violent offenses; where the defendant has previously been arrested three times while on release pending trial; where the defendant recently left the jurisdiction for two weeks apparently to conceal and/or secure proceeds of the charged bank robbery, much of which remains missing; where the proposed co-signors and the proposed third-party custodian were either unaware of defendant's whereabouts during these two weeks or they were concealing his whereabouts from the FBI; where defendant was living with the proposed third-party custodian during the time he developed his extensive arrest record, including the instant arrest; where the defendant's family has no equity in the proposed security property; where the defendant has ties to a country from which he cannot be extradited; and where the defendant only turned himself in more than a week after the FBI initiated contact with him to execute his arrest.

## Statutory Presumptions

Title 18, United States Code, Section 3142(e) provides two circumstances in which detention is presumed, subject to rebuttal by the defendant. First, detention is presumed when, in the past five years, the defendant has been convicted of, *inter*

*alia*, a crime of violence that was committed while defendant was on release pending trial. 18 U.S.C. § 3142(e)(1)-(3). This presumption applies here. As noted above, on October 5, 2007, defendant was found guilty of Battery in the Circuit Court of Cook County.[3] At the time of that offense, defendant already was on release from separate state Battery and Domestic Battery charges filed in December and November 2006, respectively.

Second, detention is presumed when there has been a finding of probable cause that the defendant has committed an offense under 18 U.S.C. § 924(c). This presumption applies here because after reviewing the criminal complaint charging defendant with a violation 18 U.S.C. § 924(c), along with a lengthy supporting affidavit, Judge Schenkier issued a warrant for defendant's arrest. Federal Rule of Criminal Procedure 4(a) provides for the issuance of an arrest warrant only if "the complaint or one or more affidavits filed with the complaint establish probable cause to believe that an offense has been committed and that the defendant committed it." Judge Schenkier's issuance of an arrest warrant in this case thus constituted a finding of probable cause that defendant committed a violation of 18 U.S.C. § 924(c). Although Judge Schenkier appeared to suggest that he would have

---

[3] Defendant's attorney has advised that this guilty finding does not constitute a "conviction" under Illinois state law because the court imposed a term of supervision, rather than probation or incarceration. At this time, the government does not know whether this is a correct statement of Illinois law, or whether the guilty finding would be a "conviction" under federal law. It is, however, undisputed that the state court entered a finding of "guilty" on the charge of Battery and imposed a term of one-year supervision. Defendant is still under this one year supervisory term.

to conduct a preliminary hearing before applying the presumption of detention, the language of the statute contains no reference to any such hearing requirement.[4]

**Analysis of the 3142(g) Factors Demonstrates That Defendant Should Be Detained**

Section 3142(g) sets forth the factors that courts are to consider in determining whether detention is appropriate. These factors fall into three broad categories: the nature and circumstances of the offense charged, the weight of the evidence against the defendant, and the history and characteristics of the defendant. Upon reviewing these factors, it is clear that no condition or combination of conditions of release will reasonably assure the safety of the community or defendant's appearance at court proceedings.

*1. The Nature and Circumstances of the Offense Charged*

As recounted in detail above, defendant is charged with a serious violent crime, involving the coercion and threatening with a loaded firearm of innocent victims. The charged offense also carries severe potential penalties, including a maximum sentence of twenty years' imprisonment for the bank robbery and a mandatory consecutive term of seven years for the firearm charge. Indeed, the government's preliminary Guidelines calculation for defendant provides an offense

---

[4] Indeed, such a construction of Section 3142(e) would create a conflict between the statutory timing requirements governing detention hearings and those governing preliminary hearings. Where the government has moved for detention, Section 3142(e) requires the court to hold a detention hearing within three days of the initial appearance. Federal Rule of Criminal Procedure 5.1(c), by contrast, permits the preliminary hearing to occur up to ten days from the initial appearance. Predicating a detention order on the occurrence of a preliminary hearing, then, would erase seven days from the preliminary hearing scheduling scheme created by statute.

level of 24 and a criminal history in Category II, which, factoring in the mandatory consecutive term on the firearm charge, yields an advisory Guidelines range of between 141 and 155 months' imprisonment.

### 2. *The Weight of the Evidence Against Defendant*

The overwhelming weight of the evidence in this case is relevant in two respects. First, the weight of the evidence is "relevant to the question of whether detention is justified by the need to protect the community." *United States v. Calabrese*, 436 F.Supp.2d 925, 927 & n.3 (N.D. Ill. 2006). Second, "[v]ery strong evidence, when coupled with the possibility of a very long sentence, is relevant to the likelihood of the accused's non-appearance at trial. Flight is always more likely when a defendant has little or nothing to lose by absconding." *Id.* Here, defendant likely faces as much as fourteen years' imprisonment in this case. As noted above, the evidence against defendant includes testimony from three witnesses whose statements are each corroborated not only by other witnesses but by phone records and video surveillance. As also noted above, store receipts, video surveillance, and police reports establish that defendant recently left the jurisdiction for an extended period during which he purchased an automobile and was found with $27,000 cash.

### 3. *Defendant's History and Characteristics*

Defendant's history and characteristics do not rebut the presumption of detention in this case. Beginning with defendant's criminal history, as described in more detail above, over the last two years, defendant has averaged an arrest approximately every three months, and all but one of his arrests were for violent

crimes. Defendant's criminal history also establishes that he fares poorly under court supervision in that, including the instant offense, he has at least four arrests and one guilty adjudication while out on release pending criminal proceedings.

Judge Schenkier largely discounted defendant's arrest record because only one of the arrests resulted in an adjudication (of the others, four were stricken on leave to reinstate and one is listed as "disposition unknown"). But Section 3142(g) mandates consideration of the defendant's "criminal history" generally, not simply his criminal convictions. And Section 3142(g)(3)(B) specifically mandates consideration of "whether, at the time of the current offenses or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law." It is undisputed that defendant was on supervision at the time of the offense in this case.

The government recognizes that arrests resulting in adjudications carry substantially more weight than those that do not. But when an arrest record evinces, as this one does, a pattern in which the defendant repeatedly engages in conduct that creates apparent probable cause to charge the defendant with violent crimes – especially when defendant engages in this conduct while under court supervision – the defendant's criminal history should not be discounted. This is particularly so when, as the government maintains, Section 3142(e) creates a rebuttable presumption of detention.

Defendant's community and family ties do not outweigh the criminal history factors or overcome the rebuttable presumption. Defendant argued, and Judge Schenkier found, that defendant has lived in the Chicago area for his entire life and has ties to the community. But these family and community ties do not overcome the factors supporting detention. First, during the entire time period discussed here, including the defendant's seven arrests in twenty months, including the robbery charged here, defendant was living at home with his family in this community. Yet when the FBI sought to execute defendant's arrest warrant at defendant's family's home, the FBI learned that defendant had suddenly become absent from the home, and his family stated that they did not know where he was, even though he and his brother were thousands of miles away staying with another family member for almost two weeks.

Second, although defendant ultimately surrendered himself to authorities, it appears that he did so only after at least attempting to secure some of the proceeds of the robbery. As recounted above, on June 4, 2008, when the arrest warrant was issued, defendant hung up on the FBI agent who had contacted him regarding his arrest warrant. Defendant's father also left defendant a voicemail message informing defendant that the FBI was looking for him. During this time, defendant was in California. A few days then passed before defendant's attorney contacted agents indicating that defendant wanted to surrender himself. An additional few days then passed before defendant finally did surrender himself at his attorney's office.

Defendant also has ties to Jordan – a country from which extradition is uncertain at best.  Although defendant  is a United States citizen, his family is from Jordan, his maternal grandparents still live in there, and defendant has traveled to that country on at least one occasion.  The United States does not have an extradition treaty with Jordan.  And as previously mentioned, a significant amount of the money stolen in the robbery is still missing.  Defendant's significant potential sentence – perhaps fourteen years' imprisonment – gives him a strong incentive to flee.

Finally, the conditions ordered by Judge Schenkier would not reasonably assure community safety and the defendant's appearance at future proceedings.  The defendant's family currently has negative equity in the real property proposed as security.  For all practical purposes, this differs little from an unsecured bond.  Additionally, as noted above, during the time defendant developed his arrest record, and when he left the area for two weeks with the proceeds of the robbery, defendant was living with at the residence proposed for home confinement with the proposed bond co-signors and the third-party custodian.

## **CONCLUSION**

For the foregoing reasons, the government respectfully submits that defendant has not rebutted the statutory presumption of detention in this case, and that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of other persons and the community. Accordingly, the government respectfully requests that the Court vacate the Order Setting Conditions of Release and order that defendant Jafilan be detained pending the trial of this matter.

                              Respectfully submitted,

                              PATRICK J. FITZGERALD
                              United States Attorney for the
                              Northern District of Illinois

            By:    /s/ Erik A. Hogstrom
                  ERIK A. HOGSTROM
                  Assistant United States Attorney
                  219 South Dearborn Street
                  Chicago, IL 60604
                  (312) 353-8709

June 23, 2008

## **CERTIFICATE OF SERVICE**

      The undersigned Assistant United States Attorney hereby certifies that the following documents:

## **MOTION TO VACATE RELEASE ORDER**

were served on June 23, 2008, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

                                                /s/ Erik A. Hogstrom
                                                ERIK A. HOGSTROM
                                                Assistant United States Attorney
                                                219 South Dearborn Street
                                                Chicago, Illinois
                                                (312) 353-8709